## PENNSYLVANIA RAILROAD CO. *v.* ILLINOIS BRICK CO.

No. 360. Argued February 6, 7, 1936.—Decided March 2, 1936.

Messrs. *Frederic D. McKenney* and *David L. Dickson,* with whom Messrs. *Frank J. Loesch, Edward M. Burke,* and *Henry Wolf Biklé* were on the brief, for petitioner.

450

*Mr. Abraham R. Miller* for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

December 31, 1924, respondent sued petitioner and the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company, called the Panhandle, in the Circuit Court of Cook County, Illinois, to recover reparation awarded by the Illinois Commerce Commission on the ground that they collected from respondent unreasonable and discriminatory charges for intrastate transportation of brick from Bernice, Illinois, to places within the Chicago switching district.[1] January 1, 1921, the Pennsylvania Railroad Company, through lease, obtained control of the Panhandle. The court gave judgment against the Pennsylvania for $44,428.09.[2] That amount includes reparation, interest and attorney's fee. The reparation adjudged is in respect of transportation on the Pennsyl-

[1] Illinois Public Utilities Act, § 72, Laws Illinois, 1921, p. 745.
[2] The case was dismissed as to the Pittsburgh Cincinnati, Chicago & St. Louis Railroad.

vania between October 28, 1920, and February 16, 1922, including that on the Panhandle after acquisition by the Pennsylvania. Petitioner appealed directly to the state supreme court and there sought reversal on the ground that, as later to be specified, the reparation order is repugnant to the Interstate Commerce Act, an order of the Commission and the Constitution of the United States. After hearing argument, that court, being of opinion that the case had been erroneously appealed to it, directed transfer to the appellate court. There the judgment was affirmed; the supreme court denied a writ of certiorari.

First for consideration is a question raised by the answer and decided by the appellate court, the highest court of the State in which a decision could be had. 28 U. S. C., § 344 (b). *Chicago, R. I. & P. Ry.* v. *Perry,* 259 U. S. 548, 551. *Home Insurance Co.* v. *Dick,* 281 U. S. 397, 407. *Minneapolis, St. P. & S. S. M. Ry. Co.* v. *Rock,* 279 U. S. 410, 411–412. *Chesapeake & Ohio Ry. Co.* v. *Mihas,* 280 U. S. 102, 104. That question is whether the Illinois statutes under which the state commission acted and its order awarding respondent reparation are repugnant to the Interstate Commerce Act [3] and the order

---

[3] The Interstate Commerce Act (Title 49, U. S. Code) provides:

Section 13(3). "Whenever . . . there shall be brought in issue any rate . . . made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding." The paragraph provides for conference and coöperation between the Interstate Commerce Commission and the state authorities.

Section 13(4). "Whenever . . . the Commission . . . finds that any such rate . . . causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful it shall prescribe the rate . . . or the maximum

of the Interstate Commerce Commission [4] providing for the intrastate rates that became effective February 19, 1921, and continued in force until February 16, 1922, in respect of which the state commission made its award.

The Chicago switching district is a large area in and near that city; it extends into Indiana but by far the larger part is in Illinois.[5] A number of railroads including the Pennsylvania and the Panhandle extend into the district and conduct within it transportation of brick and other commodities in intrastate and interstate commerce. There are many brickyards in the district and elsewhere in Illinois. Respondent has several in the district and two at Bernice in Illinois outside, but close to, the district. One of them is located on the Pennsylvania and the other on the Panhandle.

For a long time prior to federal control of railroads which commenced January 1, 1918, and up to June 25 of that year the rate applicable to interstate and intrastate transportation of brick, by the Pennsylvania and Panhandle respectively, from Bernice into the district and

---

or minimum, or maximum and minimum, thereafter to be charged . . . Such rates . . . shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any state authority to the contrary notwithstanding."

As it then stood, § 15a (2) provided: "In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that the carriers as a whole . . . will . . . earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation; *Provided,* That the Commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different sections of the country."

[4] Intrastate Rates Within Illinois, 60 I. C. C. 92.

[5] For full description see Switching Rates in Chicago District, 177 I. C. C. 669, 712.

between points within the switching district was 25 cents per ton.

June 25, 1918, the federal railroad administration by General Order No. 28 increased rates on brick by two cents per hundred pounds. November 8, 1918, Freight Rate Authority No. 1887 substituted an increase of 25 per cent. for transportation within the district. These changes operated to make the rate from Bernice into the district 70 cents [6] and that between points within the district 30 cents per ton.

The Transportation Act (of February 28), 1920, § 208 (a), directed that existing rates should obtain until changed by federal or state authority or pursuant to authority of law.

March 10, 1920, respondent complained to the Interstate Commerce Commission that the 70-cent rate was unreasonable and discriminatory. The commission made its report and order October 27, 1921, the pertinent substance of which is given below.

July 29, 1920, the commission authorized increases applicable to interstate traffic of 40 per cent. and 35 per cent. respectively, in eastern and western groups and 33⅓ per cent. on intergroup transportation. Ex parte 74.[7] August 10, the Illinois commission authorized a general increase of 33⅓ per cent.[8] August 11, the Interstate Commerce Commission ordered that Illinois territory be treated as within the eastern group for the purpose of applying the authorized increase of 40 per cent. in the rates on interstate traffic between points in that territory.[9]

August 26, rates on intrastate transportation of brick established by the carriers pursuant to authority of the Illi-

---

[6] General Order 28, § 6 provides that 5 cents or more shall be increased to 10 cents. And so here 65 cents became 70 cents.

[7] Increased Rates, 1920, 58 I. C. C. 220.

[8] Docket No. 10,620, 7 Ill. P. U. C. 1047.

[9] Authority to Increase Rates, 58 I. C. C. 302.

nois commission became effective. They were 93½ cents per ton from Bernice into the switching district in Illinois, and 40 cents between Illinois points within the district. October 18, having regard to the above mentioned order of August 11, the Illinois commission modified its order of August 10 so as to allow increases of 35 per cent. to be made effective November 15, instead of the 33⅓ per cent. it earlier permitted.[10] Accordingly the intrastate rate from Bernice into the switching district became 94½ cents and the rate between points within the district became 40½ cents.

January 11, 1921, the Interstate Commerce Commission dealing with intrastate rates within Illinois, notified and required carriers to cease and desist from practicing the undue prejudice, undue preference and advantage, and unjust discrimination which, as specified in the commission's report it found to exist. The order also notified and required the carriers to

"establish, put in force, and maintain rates and charges for freight services . . . in intrastate commerce within the state of Illinois which shall exceed the rates and charges of the carriers now in force and applicable to such transportation in amounts corresponding to the increases heretofore made by the carriers, now in effect, under Ex Parte 74 . . . in said carriers' rates and charges for freight services . . . in interstate commerce within the state of Illinois and between points in the state of Illinois and points in other states in the eastern group, including the Illinois district. It is further ordered, That this order shall become effective on or before the 7th day of March, 1921, upon notice . . . by not less than five days' filing and posting in the manner prescribed in section 6 of the Interstate Commerce Act, and remain in force until the further order of this Commission in the premises.".

[10] Docket No. 10,620, 8 Ill. P. U. C. 31.

And the report, which was made a part of the order, stated:

"Some readjustments may be appropriate in individual instances where substantial injury results . . . Such inequalities as call for readjustment may be brought to our attention in the appropriate way and dealt with as occasion requires . . . The record establishes that the present intrastate charges for freight services . . . lower than the just and reasonable corresponding interstate rates and charges authorized in and established in the eastern group, including the Illinois district, pursuant to Ex Parte 74, afford intrastate traffic and shippers and localities within the state undue preference and subject interstate traffic and shippers and localities outside the state to undue prejudice, and unduly, unjustly, and unreasonably discriminate against interstate commerce." [11] February 19, 1921, the carriers, in accordance with the commission's order, put in effect and until February 16, 1922, maintained for intrastate transportation a rate of 98 cents on brick from Bernice into the switching district and a rate of 42 cents between points within the district.

October 27, 1921, the Interstate Commerce Commission, dealing with plaintiff's complaint filed March 10, 1920, found the 70-cent rate on brick in interstate commerce from Bernice into the district was not unreasonable but that it was and for the future would be unduly prejudicial to the extent that it exceeded the rates from points within the district to interstate destinations therein by more than 10 cents per ton. It further found that respondent failed to show itself entitled to damages as the result of the undue prejudice.[12] The commission ordered that the carriers "cease and desist, on or before February 16, 1922, . . . from . . . collecting for the transportation of common brick in carloads, from Bernice . . . [and

[11] Intrastate Rates Within Illinois, 60 I. C. C. 92, 103–104.

[12] Illinois Brick Co. v. Director General, 64 I. C. C. 273.

other named points in Illinois and Indiana] to interstate destinations within the Chicago switching district rates which exceed the rates contemporaneously maintained by them on like traffic from points within said district to interstate destinations within said district by more than 10 cents per net ton."

And it ordered the carriers to

"establish, on or before February 16, 1922, upon notice . . . by not less than 30 days' filing and posting . . . and thereafter to maintain and apply to the transportation of common brick, in carloads, from Bernice . . . [and other named points] to interstate destinations within the Chicago switching district rates which shall not exceed the rates contemporaneously maintained by them on like traffic from points within said switching district to interstate destinations within said district by more than 10 cents per net ton."

Then the carriers established and put in force, effective February 16, 1922, a rate of 50 cents per ton for intrastate and interstate transportation from Bernice into the switching district and between points within it.

October 28, 1922, respondent applied to the Illinois commission for reparation as to intrastate transportation from Bernice into the switching district. November 7, 1923 the commission dismissed the claim as to shipments prior to October 28, 1920, as barred by a statute of limitations. The commission found that, at the time the service in question was rendered (October 28, 1920, to February 16, 1922) 50 cents per ton provided adequate revenue for transportation of brick from Bernice to points within the switching district; that to the extent the rates for that transportation exceeded by more than 10 cents per ton the rates contemporaneously applied between points within the district they were unjustly discriminatory and that respondent had been damaged to the extent that the charges collected by the carrier exceeded

those that would have been assessed on a rate of 50 cents per ton. And on that basis the commission fixed the amount of its award.[13]

■ To the extent, if at all, that there is conflict between state and federal regulation, the latter must prevail. Unquestionably the Interstate Commerce Commission was authorized directly to prescribe, or to require the carriers to establish and maintain, intrastate rates to prevent or remove discrimination against interstate commerce or to make intrastate transportation yield its just proportion of the carriers' earnings. *Florida* v. *United States,* 282 U. S. 194, 210. *Public Service Comm'n* v. *Texas & N. O. R. Co.,* 284 U. S. 125, 131. *Florida* v. *United States,* 292 U. S. 1, 4. During the period between February 19, 1921, and February 16, 1922, the intrastate rates in force for transportation of brick by petitioner's railroad from Bernice into the switching district were maintained by petitioner pursuant to and in accordance with the Interstate Commerce Commission's order of January 11, 1921. By that order the commission "notified and required" carriers to cease the prejudice and discrimination against interstate commerce resulting from the application of their intrastate rates in force and also "notified and required" them to increase their intrastate rates and to make them correspond with the interstate rates theretofore increased in pursuance of its order in Ex parte 74. The commission's direction to the carriers that they collect charges based on the intrastate rates required by its order was not less mandatory than was its direction to cease prejudice and discrimination. In order that the prescribed equality between intrastate and corresponding interstate rates should not be disturbed by state authority or by action of the carriers, the commission declared that the order— and necessarily the rates directed—should continue in force until changed by it.

---

[13] Docket No. 12,765, 3 Ill. C. C. 165, 300.

And, anticipating possible need for further action, the commission expressly suggested that individual instances of inequalities be brought to its attention for correction. Although respondent's complaint against the 70-cent rate established by Freight Rate Authority No. 1887 was still pending, the record discloses no application by respondent to amend or enlarge the scope of the complaint or any effort to have reduced the 98-cent rate directed by the Interstate Commerce Commission, or to have corrected the inequality resulting from its order of January 11, 1921. There is no suggestion that the intrastate rates in respect of which the Illinois commission awarded reparation were not made in obedience to and in strict accordance with the order of the Interstate Commerce Commission. Save as the rate so prescribed might be dealt with under federal law, the carriers were bound to collect the charges based upon them. By the Interstate Commerce Act and that order, the State was divested of jurisdiction, by specific order, award of reparation or otherwise, to reduce the charges based on the intrastate rates so established. The order of the Illinois commission, in so far as it awards reparation in respect of transportation covered by rates that petitioner was required to put in force and maintain by the Interstate Commerce Commission's order of January 11, 1921, is plainly repugnant to the Interstate Commerce Act and to that order. To the extent, therefore, that the judgment depends on that part of the award, it is without foundation and cannot be sustained.

■ Under the Interstate Commerce Commission's order of October 27, 1921, petitioner was free, upon the prescribed notice of 30 days, though not required before February 16, 1922, to reduce to not to exceed ten cents the differential between the interstate rate from Bernice into the switching district and that for interstate transportation beween points within the district. That order

dealt only with interstate rates. But the order of January 11, 1921, established the rule of equality between rates for interstate and intrastate transportation from Bernice into the district and also for transportation between points within the district. On the facts found by the Interstate Commerce Commission and the law as applied by it, petitioner was required to maintain equality between these intrastate and interstate rates. There is nothing in the later report or order of October, 1921, to indicate intention on the part of the commission to authorize or permit a change of the one without a like change in the other. The purpose, by exertion of federal authority to control both, persisted. The state commission was not, at any time after the intrastate rates were established under federal authority, authorized to condemn them or to award reparation in respect of transportation to which they applied. By the order of October 27, 1921, requiring adjustment of the interstate rates upon 30 days' notice on or before February 16, 1922, the commission impliedly found that the time allowed was necessary to enable the carriers to compute the rates, prepare the schedules and post them as required by law. There is no support for a claim that, as to transportation in the part of the period between the order October 27, 1921, and February 16, 1922, the Illinois commission had jurisdiction to grant reparation.

■ There remains for consideration the part of the judgment that is based on the award made in respect of transportation between the earliest date within the period fixed by the statute of limitations, October 28, 1920, and the effective date of the commission's order, February 19, 1921. The intrastate rates in effect during that time were made under authority of the State acting through its commission and pursuant to the above mentioned orders of the latter, August 10, 1920, authorizing 33⅓ per cent. increase and October 18, 1920, making the

increase 35 per cent. The rates so increased superseded the 70-cent rate made by the carrier while under federal control. The state's jurisdiction as to them was untrammeled by any order of the Interstate Commerce Commission or other exertion of federal power. The reparation order, so far as it relates to that service, must be sustained unless found repugnant to the due process clause of the Fourteenth Amendment to, or the commerce clause of, the Federal Constitution.

No such question was, by answer, motion or otherwise, expressly raised in the trial court. Petitioner makes no claim that the reparation order was specifically challenged in the trial court as repugnant to either of these clauses, asserts that it was not necessary so to do and maintains that, at the trial, there was by petitioner sufficiently drawn in question the validity of the order on the ground of its being repugnant to these provisions. The sole support for that claim is this: Respondent put in evidence the state commission's reparation order and the record on which it was based. In defense petitioner introduced the same record and the state commission's rate orders authorizing respectively 93½ cents and 94½ cents per ton for transportation from Bernice into the switching district.

Plainly that was not enough. The Illinois statute requires that in cases involving construction of the Federal Constitution appeals from circuit courts shall be taken directly to the supreme court.[14] And, as definitely shown by its decisions, that court will not take jurisdiction unless it appears from the record that the constitutional ques-

[14] Practice Act of 1907, § 118, Laws 1907, p. 443, repealed and replaced by Civil Practice Act of June 23, 1933, §§ 75, 94, effective January 1, 1934, Laws 1933, pp. 805, 811. Smith-Hurd Rev. Stats. 1935, c. 110, §§ 199, 218. *Van Dyke* v. *Illinois Commercial Men's Assn.*, 358 Ill. 458, 464; 193 N. E. 490. *Central Union Telephone Co.* v. *Edwardsville*, 269 U. S. 190, 194.

tion was urged in the lower court, the ruling on it preserved in the record and the error assigned on appeal.[15] While the order of that court transferring the case does not specify the grounds on which it was based, the petitioner states that the supreme court necessarily held the constitutional questions had not been properly raised and that, on the oral argument, the chief justice stated that the transfer would be made because of petitioner's failure properly to raise and preserve the constitutional questions. The appellate court so understood the grounds and effect of the order and held that by transferring the case the supreme court eliminated the constitutional questions. As the highest court of the State declined to consider them because not raised in the circuit court or presented to it in accordance with practice that unquestionably was well established and reasonable, this court is without jurisdiction to consider either of them. *Chicago, I. & L. Ry. Co.* v. *McGuire,* 196 U. S. 128, 131. *Hulbert* v. *Chicago,* 202 U. S. 275. *Cox* v. *Texas,* 202 U. S. 446, 452. *Louisville & Nashville R. Co.* v. *Woodford,* 234 U. S. 46, 51.

■ Petitioner's application for this writ suggests that, by a construction contrary to that theretofore put upon § 68 of the Illinois Public Utilities Act, it was denied an opportunity to be heard on the question whether the evidence before the Illinois commission was sufficient to sustain the reparation award. And upon that basis petitioner claims that there is here presented the question whether by denial of hearing it was deprived of property without due process of law. But, as is shown by the opinion of the appellate court, it did hear petitioner and respondent on that question and decided it in favor of the latter.

---

[15] *Foreman-State Nat. Bank* v. *Sistek,* 358 Ill. 525, 529–530; 193 N. E. 513. *Hoffman* v. *Sears Community Bank,* 356 Ill. 598, 601; 191 N. E. 280. *Albrecht* v. *Omphghent Township,* 324 Ill. 200, 202; 154 N. E. 898.

464

There is no foundation for petitioner's claim that it was denied hearing.

The judgment below will be reversed and the case remanded with directions for proceedings not inconsistent with this opinion.

*Reversed.*